NO. 13-13190-AA

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

JOSEPH HARPER,

Appellee,

v.

JEREMIAH DAVIS, et al.,

Appellants.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION
CIVIL ACTION NO. 5:10-cv-00047

---

BRIEF ON BEHALF OF APPELLANT MATT GOURLEY

---

|  |  |  |
|---|---|---|
|  | SAMUEL S. OLENS<br>Attorney General | 551540 |
|  | NELS PETERSON<br>Solicitor General | 101074 |
| Please serve: | KATHLEEN M. PACIOUS<br>Deputy Attorney General | 558555 |
| LAURA L. LONES<br>State Law Department<br>40 Capitol Square, S.W. | DEVON ORLAND<br>Senior Assistant Attorney General | 554301 |
| Atlanta, Georgia 30334-1300<br>(404) 463-8850 | LAURA L. LONES<br>Assistant Attorney General | 456778 |

*NO. 13-13190-AA*

*HARPER v. DAVIS*

**CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT**

Pursuant to 11 Circuit Rule 26.1-1, the following have an interest in the outcome of this case:

Association of County Commissioners of Georgia-Interlocal Risk Management Agency (ACCG-IRMA)—*Risk Management Pool Fund*

J. Alexander Atwood—*Attorney for Plaintiff/Appellee*

Brown, Readdick, Bumgartner, Carter, Strickland, & Watkins, LLP—*Attorneys for Defendant/Appellant Davis*

Jeremiah Davis—*Defendant/Appellant*

Matt Gourley—*Defendant/Appellant*

Joseph Harper—*Plaintiff/Appellee*

Robert P. Killian—*Attorney for Plaintiff/Appellee*

Assistant Attorney General Laura L. Lones—*Attorney for Defendant/Appellant Gourley*

Attorney General Samuel S. Olens—*Attorney for Defendant/Appellant Gourley*

Senior Assistant Attorney General Devon Orland—*Attorney for Defendant/Appellant Gourley*

Deputy Attorney General Kathleen M. Pacious—*Attorney for Defendant/Appellant Gourley*

Solicitor General Nels Peterson—*Attorney for Defendant/Appellee Gourley*

State of Georgia Department of Law—*Attorneys for Defendant/Appellant Gourley*

Richard K. Strickland—*Attorney for Defendant/Appellant Davis*

Hon. Lisa G. Wood—*Chief Judge, United States District Court for the Southern District of Georgia*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Gourley requests oral argument, believing that it will aid the decisional process. Because a detailed factual review of the record is necessary when deciding issues of qualified immunity, oral argument gives counsel an opportunity to address any questions the panel may have following its review of the record and briefs in this matter. *See Rogers v. Miller*, 57 F. 3d 986, 989 (11th Cir. 1995)("[b]ecause entitlement to qualified immunity is fact specific, before engaging in this analysis, we must examine in detail the contentions and inferences arising from the record regarding each of the defendant's conduct"); *Sanders v Howze,* 177 F. 3d 1245 (11th Cir. 1995).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................. C1 of XX

STATEMENT REGARDING ORAL ARGUMENT ........................................ i

TABLE OF CONTENTS ............................................................................. ii

TABLE OF CITATIONS .......................................................................... iv

STATEMENT REGARDING ADOPTION OF BRIEFS

      OF OTHER PARTIES ....................................................................... viii

STATEMENT OF JURISDICTION ......................................................... ix

STATEMENT OF THE ISSUES ............................................................... 1

STATEMENT OF THE CASE ................................................................... 3

    (i)     Course of Proceedings ......................................................... 3

    (ii)    Statement of Facts............................................................... 7

    (iii)   Statement of the Standard of Review ............................... 15

SUMMARY OF THE ARGUMENT ......................................................... 17

ARGUMENT AND CITATION OF AUTHORITY ................................... 19

        I.      The district court erred in denying qualified
                immunity to Canine Officer Gourley based
                on his unsuccessful attempt to taser a violent,
                intoxicated suspect who had fled into a wooded
                area in the middle of the night with a rifle he
                had just discharged in the family residence,
                who was located hiding in a tree, and who—the
                officer was informed immediately before the

attempted tasering—had the rifle "up in the
tree with him"......................................................19

A.    The district court erred in finding and
      relying on "facts" not supported by the
      evidence of applicable under the governing
      legal standards............................................19

B.    The evidence, properly viewed, failed to
      establish an actionable constitutional
      violation by Canine Officer Gourley....................26

      1.    The tasering of Harper did not
            constitute excessive force under
            the totality of the circumstances..................26

      2.    Canine Officer Gourley cannot be
            held liable for Deputy Davis's
            tasering of Harper.................................32

      3.    The evidence did not demonstrate
            a clearly established constitutional
            violation............................................34

CONCLUSION..............................................................38

CERTIFICATE OF COMPLIANCE ...........................................39

CERTIFICATE OF SERVICE ...............................................40

# TABLE OF CITATIONS

## CASES

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986)....................................16

*Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009)...................................................32

*Beecher v. City of Tacoma*, 2012 U.S. Dist. LEXIS 71927
(W.D. Wash. 2012)...............................................................................26, 30

*Brown v. City of Huntsville, Ala.*, 608 F.3d 724 (11th Cir. 2010)....................33

*Brown v. Smith*, 813 F.2d 1187 (11th Cir. 1987).....................................32

*Buckley v. Haddock*, 292 Fed.Appx. 791 (11th Cir. 2008).......................27, 29

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)........................................16

*Coffin v. Brandau*, 642 F.3d 999 (11th Cir. 2011) (*en banc*).........................35

*Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949).........................ix

*Crosby v. Monroe*, 394 F.3d 1328 (11th Cir. 2004)..............................34, 37

*Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004)..............................27, 28

*Edwards v. Shanley*, 666 F.3d 1289 (11th Cir. 2012)...........................28, 29

*Ellis v. England*, 432 F.3d 1321 (11th Cir. 2005).................................16, 22

*Evans v. Stephens*, 407 F.3d 1272 (11th Cir. 2005) (*en banc*).....................7, 16

*Feliciano v. City of Miami Beach*, 707 F.3d 1244 (11th Cir. 2013).................7

*Fils v. City of Aventura*, 647 F.3d 1272 (11th Cir. 2011).......................29, 33

*Fundiller v. City of Cooper City*, 777 F.2d 1436 (11th Cir. 1985).................33

iv

*Garczynski v. Bradshaw*, 573 F.3d 1158 (11th Cir. 2009)................20, 24, 27

*Glenn v. City of Columbus, Ga.*, 375 Fed.Appx. 928 (11th Cir. 2010)...22, 27, 30

*Goebert v. Lee*, 510 F.3d 1312 (11th Cir. 2007)......................................32

*Graham v. Connor*, 490 U.S. 386 (1989)..............................................*passim*

*Hope v. Pelzer*, 536 U.S. 730 (2002)....................................................34

*Hudson v. Hall*, 231 F.3d 1289 (11th Cir. 2000)......................................34

*Jean-Baptiste v. Gutierrez*, 627 F.3d 816 (11th Cir. 2010)....................30, 37

*Long v. Slaton*, 508 F.3d 576 (11th Cir. 2007)...............................27, 30, 35

*Maddox v. Stephens*, No. 12-15237 (11th Cir. Aug. 21, 2013)......................34

*Mitchell v. Forsyth*, 472 U.S. 511 (1985)..................................................ix

*Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739 (11th Cir. 1996)..............16, 22

*Morton v. Kirkwood*, 707 F.3d 1276 (11th Cir. 2013)..................................15

*Oakes v. Anderson*, 494 Fed.Appx. 35 (11th Cir. 2012)......................... 28, 30

*Pearson v. Callahan*, 129 S.Ct. 808 (2009)................................................34

*Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919 (11th Cir. 2000)..............33

*Rizzo v. Goode*, 423 U.S. 362 (1976).....................................................32

*Robinson v. Arrugueta*, 415 F.3d 1252 (11th Cir. 2005)..........................19, 24

*Rogers v. Miller*, 57 F. 3d 986 (11th Cir. 1995).........................................i

*Sanders v Howze,* 177 F. 3d 1245 (11th Cir. 1995).....................................i

*Taylor v. Freeman*, 447 Fed.Appx. 78 (11th Cir. 2011)..............................29

*Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002)............................34, 35

*Willingham v. Loughnan*, 321 F.3d 1299 (11th Cir. 2003)....................35, 36

## **STATUTES**

28 U.S.C. § 1291................................................................ix

28 U.S.C. § 1331................................................................ix

O.C.G.A. § 16-5-20...........................................................28

O.C.G.A. § 16-5-21...........................................................28

O.C.G.A. § 16-5-23...........................................................28

O.C.G.A. § 16-5-23.1.........................................................28

O.C.G.A. § 16-5-70...........................................................28

O.C.G.A. § 16-11-37..........................................................28

O.C.G.A. § 16-11-39..........................................................28

O.C.G.A. § 16-11-102.........................................................28

O.C.G.A. § 16-11-106.........................................................28

O.C.G.A. § 16-11-134.........................................................28

O.C.G.A. § 16-13-26..........................................................28

O.C.G.A. § 16-13-30..........................................................28

## FEDERAL RULES

Fed.R.App.P. 4(a)(1)(A)...................................................................ix

Fed.R.Civ.P. 56(c).........................................................................15

## STATEMENT REGARDING ADOPTION
## OF BRIEFS OF OTHER PARTIES

Appellant Gourley adopts the brief of Appellant Davis insofar as that brief argues that the tasering of Harper was lawful and that the district court erred in denying qualified immunity.

## STATEMENT OF JURISDICTION

The District Court had federal question jurisdiction pursuant to 28 U.S.C. § 1331. Defendants filed motions for summary judgment raising the defense of qualified immunity. (R67; R72). On June 17, 2013, the district court entered an order which denied summary judgment to Defendants Davis and Gourley, including a denial to these Defendants of the defense of qualified immunity on Plaintiff's constitutional claims. (R97). Because the district court order denied the defense of qualified immunity, the Order is directly appealable pursuant to the "collateral order doctrine" under *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 69 S. Ct. 1221 (1949) as applied to qualified immunity cases. *Mitchell v. Forsyth*, 472 U.S. 511, 526-27, 105 S. Ct. 2806, 2815 (1985). These Defendants filed a timely notice of appeal on July 15, 2013. (R98); Fed.R.App.P. 4(a)(1)(A). Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I. Whether the district court erred in denying qualified immunity to Canine Officer Gourley based on his unsuccessful attempt to taser a violent, intoxicated suspect who had fled into a wooded area in the middle of the night with a rifle he had discharged in the family residence, who was located hiding in a tree, and who—the officer was informed immediately before the attempted tasering—had the rifle "up in the tree with him"?

1. Whether the district court erred in finding and relying on "facts" not supported by the evidence or applicable under the governing legal standards?

2. Whether the district court erred in concluding that the evidence, properly viewed, could establish an actionable constitutional violation by Canine Officer Gourley?

   a. Whether the district court erred by viewing the undisputed facts from the perspective of the Plaintiff rather than that of a reasonable officer in concluding that the tasering of Harper could constitute excessive force under the totality of the circumstances?

   b. Whether the district court erred in concluding that Gourley could be held liable for Deputy Davis's tasering of Harper?

1

c.     Whether the district court erred in concluding that the evidence demonstrated a clearly established constitutional violation?

## STATEMENT OF THE CASE

(i)        *Course of Proceedings*

Joseph Harper initiated this action in the Southern District of Georgia, suing

four Defendants:   Coffee County Sheriff's Deputies Chris Perkins, Rodney

Courson, and Jeremiah Davis; and Matt Gourley, a canine officer at Ware State

Prison (collectively, the Officers).  (R1).  Harper alleged, among other things, that

the Officers violated his Fourth and Fourteenth Amendment rights in using

excessive force to take him into custody after they found him hiding in a tree with

a firearm.[1]  (*Id.*).

After the conclusion of discovery, the Defendants all moved for summary

judgment.  (R67; R72).  Canine Officer Gourley argued that Harper could not

prove an excessive-force claim against him because (1) his attempt to taser Harper

had been unsuccessful and he could not be held liable for the actions of anyone

else; (2) he was not in a position to intervene to prevent the tasering that resulted in

Harper's fall; (3) the use of the taser was justified, and therefore, excessive force

was not used; and (4) he was entitled to qualified immunity.  (R72-1 at 9-17).

---

[1] The District Court dismissed some claims, but denied the motions to dismiss as
to the Fourth and Fourteenth Amendment claims against all of the Officers.  (R33).
Defendants appealed that ruling.  (R35).  This Court affirmed.  (R46; R48).

Harper responded by arguing that (1) he was not a threat because he was surrendering; (2) Canine Officer Gourley had a duty to intervene; and (3) Gourley was not entitled to qualified immunity. (R78 at 6-13). Gourley replied that Harper (1) failed to cite evidence for many of the inferences he desired the court to make; (2) improperly asked the court to apply a subjective, rather than objective, legal standard; and (3) failed to make a sufficient showing to remove the shield of qualified immunity from Gourley. (R87).

The district court granted summary judgment to two Officers (Perkins and Courson), but denied the motions as to Deputy Davis and Canine Officer Gourley. (R97 at 10). After setting forth its version of the facts, the court summarized the incident, stating that

> [t]he entire incident happened extremely fast. Plaintiff estimated that from when he first saw Defendants coming into the woods till the time he was tased was "maybe a minute." From the time Plaintiff informed Defendants of his location up in the tree until the time he was tased was a matter of seconds.

(*Id.* at 8). The court then applied the applicable totality-of-the-circumstances test, weighing the quantum of force used against the three factors[2] emphasized by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989). (*Id.* at 11-16). First,

the court concluded that the amount of force used was "substantial." (*Id.* at 11-16). The court largely based this determination on the fact that Harper was in an elevated position and that he became paralyzed from the fall rather than on the use of the taser itself. (*Id.* at 12). Next, the court determined that the severity-of-the-crime factor weighed in favor of Officer Gourley (and Deputy Davis) given the violent acts they had been told that Harper had committed. (*Id.* at 12-13). Then, the court ruled that Harper constituted a "minimal threat" because he had raised his hands in surrender and his firearm was out of reach. (*Id.* at 13-15). Finally, again based on Harper's showing of his hands, the court found that he was not resisting. (*Id.* at 15-16). Weighting these factors, the court concluded that "[d]eploying a taser on [Harper] under the circumstances constituted excessive force." (*Id.* at 16). In making this finding, the court did not acknowledge that Officer Perkins had shouted out a warning that Harper had a firearm "up in the tree with him" immediately prior to Gourley's use of the taser. The court also failed to acknowledge that Harper had access to the gun even if, as Harper suggested, it was not immediately within his reach.

---

[2] Those factors are (1) the severity of the crimes the suspect has possibly committed; (2) the immediacy of the threat posed by the suspect; and (3) whether the suspect is fleeing or resisting arrest. *Graham*, 490 U.S. at 396.

Additionally, the court rejected Gourley's argument that he was not liable because his tasering of Harper was not successful because (1) Deputy Davis deployed his taser because Gourley's was unsuccessful; and (2) Davis "did not violate Plaintiff's Fourth Amendment rights solely because his taser was the immediate cause of Plaintiff's paralysis." (*Id.* at 16). The court further held that Gourley was not entitled to qualified immunity because (1) "it was clearly established under the 'obvious clarity' test that [his] conduct was unlawful; and (2) existing caselaw clearly established that the use of substantial force was excessive against a compliant suspect. (*Id.* at 17-18).

Finally, the court concluded that Deputies Courson and Perkins were entitled to summary judgment because they "had no opportunity to intervene prior to Officer Davis's deployment of the taser." (*Id.* at 19).

Deputy Davis and Canine Officer Gourley now appeal the denial of qualified immunity pursuant to the collateral order doctrine. (R98).

(ii)     *Statement of Facts*

The uncontroverted facts, Harper's version of the facts,[3] and the otherwise controverted facts viewed in the light most favorable to Harper show the following:[4]

On May 26, 2008, which was Memorial Day, Plaintiff Joseph Harper was living in Coffee County, Georgia, with his fiancée Mary Crimmins, their two young children, his nephew Brandon Singleton, and Singleton's wife. (R64 at 41-42, 120 and Def. Exh. 6). In the area near their house, there were other occupied dwellings. (R64 at 120-21 and Def. Exh. 6). At that time, Defendant Gourley was employed as a canine officer with the Georgia Department of Corrections and Defendant Davis was a deputy and canine handler employed by the Coffee County Sheriff's Department. (R63 at 5, 9; R65 dep. at 9).

---

[3] *See Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (*en banc*) ("when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version*.   Our duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part: the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided") (emphasis in original).

[4] Officer Gourley does not necessarily concede that all of these facts accurately describe what occurred on the night in question, but he submits that these are the operative facts for summary judgment, and therefore, for this appeal.   *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1248 (11th Cir. 2013) ("[T]he 'facts,' as accepted for purposes of summary judgment, may not be the actual facts of the case").

That afternoon, Harper and Crimmins went to a barbeque at the home of Harper's sister Laverne. (R64 at 41-42). While at Laverne's house, Harper consumed approximately six regular-sized bottles of beer in a period of two to three hours. (R64 at 45). He and Crimmins left the barbeque earlier than he wanted to do so, making him angry and upset with Crimmins. (R64 at 49-50).

After leaving the barbeque, Harper and Crimmins went to visit his cousin Eric Dibble. (R64 at 45). While at Dibble's house for "a couple of hours," Harper consumed "a few shots of some kind of liquor." (R64 at 46). He and Crimmins then left Dibble's house and went home. (R64 at 47).

When he got home, Harper visited a neighbor and drank a beer or two over a period of approximately 45 minutes. (R64 at 47-48). He then wanted to use Crimmins's vehicle to go get more alcohol. (R64 at 48). She would not let him use her van because he was intoxicated. (R64 at 48).

Harper continued to be angry and upset with Crimmins. (R64 at 53-54). They argued and the disagreement became physical. (R64 at 54, 56-57). One of their sons was present during the time when Harper was attempting to physically subdue Crimmins. (R64 at 35, 62). When Crimmins threatened to call the police, Harper grabbed her phone and threw it at a wall. (R64 at 56).

At some point during the conflict, Singleton came into the living room and tried to calm Harper down. (R64 at 62-63). Harper went into the master bedroom and got a .22 rifle. (R64 at 63). Crimmins left the house with the children, got in a vehicle and drove away. (R64 at 64-65).

Harper admits he may have pointed the rifle at Singleton. (R64 at 66-67). While in the house, he discharged the rifle several times. (R64 at 68). He then left the house with the rifle. (R64 at 68). He ran through the wooded area behind the house, stopping at a tree and placing the rifle in the tree. (R64 at 74, 120 and Def. Exh. 6).

At some point before Harper left the house, Singleton called Coffee County 911. (R64 at 23; R68, Exh. A; R67-2). Singleton told the 911 dispatcher "I got fuckin' a man pointin' guns at everybody, beatin' on his wife, I need the fuckin' police out here now." (R68, Ex. A; R67-2 at 1). The dispatcher asked Singleton "is he still there?" and he answered, "Yes he's still in the house now. I got two little kids in here, my wife is here. I need the police out here now." (R68, Exh. A; R67-2 at 1).

The dispatcher sent Deputy Perkins to the house at approximately 10:25 p.m. (R68, Exh. A; R67-2 at 1; R62 at 56, 61). Sgt. Courson responded as a backup. (R66 at 27). The dispatcher informed Perkins "We received a 911 call from a

Brandon subject. He advised there was a man there with a 10-32[5] gun pointed at everybody." (R68, Exh. A; R67-2 at 1; R62 at 62).

The dispatcher again made contact with Singleton and asked him "is that man still there in the house?" (R68, Exh. A; R67-2 at 2). He answered, "Yes! Yes and he's fixin' to fuckin' shoot somebody. I need some cops out here now!" (R68, Exh. A; R67-2 at 2). He further said that "The woman is leaving now with the kids and he is chasing them with a fuckin,' a fuckin' [knife??]." (R68, Exh. A; R67-2 at 2). The dispatcher informed Deputy Perkins, "Be advised we were able to make contact and he said that his wife and kids left the residence in a vehicle and the guy with the 10-32 gun left following them." (R68, Exh. A; R67-2 at 3; R62 at 57).

The dispatcher again re-established contact with Singleton who said "I just now called, and the lady been trying to call me back and he's fuckin' shootin' the gun inside, I need some, I need some officers out here now!" (R68, Exh. A; R67-2 at 3). Singleton added that the wife and children had left "but I'm still here dealing with him and he's got a fuckin' gun . . . and he's shootin' it in the house . . . and my wife's inside and I need someone out here to help me." (R68, Exh. A; R67-2 at 4). The dispatcher informed Deputy Perkins that "the guy with the 10-32 gun, it

_____

[5] "10-32" is the police code for "man with gun." *See* policecodes.org/police-10-

was his wife and kids that left. The complainant's wife and kids are still at the house and the offender is now inside the house and he's shootin' off the 10-32 gun." (R68, Exh. A; R67-2 at 4; R62 at 57, 62).

When Harper heard sirens and saw police lights coming, he climbed into the tree in which he had placed the rifle. (R64 at 78). It is undisputed that his location in the tree, the high ground, gave him a tactical advantage over those on the ground. (R63 at 100, 102, 104).

While en route to the house, Deputy Perkins met Crimmins at an intersection where she flagged him down. (R62 at 57, 64). Perkins saw that she "had some visible injuries." (R62 at 57). Crimmins told Perkins that Harper "had been drinking pretty much all day and had been taking methadone" and said that he was "extremely intoxicated." (R62 at 57, 66, 105).

Deputy Perkins travelled on to the house where he and Sgt. Courson met with Singleton. (R62 at 57; R66 at 27). Perkins shared with Courson the information Crimmins had provided. (R62 at 77). Singleton informed Perkins and Courson that he (Singleton) had heard yelling and screaming, went to the room from which the noise was coming, and saw Harper on top of Crimmins, holding her arms down and beating her. (R62 at 57, 68; R66 at 32). Singleton said that he

codes.

told Harper to stop and that Harper then went to his bedroom and returned with a rifle. (R62 at 57, 68-69).

Singleton stated that Crimmins left the house at that point. (R62 at 58). He further told the officers that Harper had pointed a gun at him, yelled at him (Singleton) and began firing the rifle at the ceiling. (R62 at 58, 69, 72; R66 at 32). Deputy Perkins saw five holes in the ceiling. (R62 at 58). Singleton informed Perkins that Harper said he was going to kill himself and then ran out the back door with the rifle. (R62 at 58, 69).

Perkins and Courson requested the assistance of canine units to help locate Plaintiff. (R62 at 58; R66 at 35). Deputy Davis was contacted by a dispatcher who told him that a tracking dog was needed to locate an armed man. (R63 at 34). Late at night, Deputy Davis contacted Canine Officer Gourley to assist in tracking because "they had a dangerous situation where a subject had fled in the woods with a rifle." (R63 at 34; R65 at 8; R72-3, ¶ 4).

On the way to the house, Canine Officer Gourley stopped and spoke with Crimmins by the side of the road. (R65 at 20). She informed Gourley that "she was afraid to go to her house because of what had happened." (R65 at 21).

Deputy Davis and Canine Officer Gourley arrived at Harper's residence with one dog, Gourley's bloodhound. (R65 at 23; R63 at 35-36). Deputy Perkins then

told them "what I had learned, everything that I'd learned what had happened." (R62 at 79; R66 at 36; R63 at 34-35, 102; R65 at 8).  More specifically, Perkins told them "Everything he done to her, that he ran out the back door with a gun in his hands in the woods, intoxicated, possibly high on methadone.  Everything that I had learned, I told them what was going on," and that Harper had fired rounds in the house, threatened to kill people, had attacked his wife, had a weapon he had already discharged, and possibly also had a knife.  (R62 at 79; R63 at 35; R66 at 36; R65 at 9).  The officers were concerned that Harper might hurt himself or someone else.  (R62 at 81; R63 at 36-37[6]).  Perkins instructed the officers to wear bulletproof vests, which was not the norm for tracking a suspect.  (R63 at 34-35; R65 at 23).

It was the middle of the night and "extremely dark" with "no lights" in the wooded area behind the house.  (R62 at 58; R63 at 100; R72-3, ¶ 5).  Canine Officer Gourley and Deputy Davis lead the way with the dog.  (R62 at 58; R66 at 37; R63 at 38; R65 at 24).  Harper saw flashlights coming through the woods and then saw that they were following a dog.  (R64 at 82-83).

---

[6]  Said Deputy Davis:  "I remember that I had the gist of the idea from that briefing that the man was armed, he'd already displayed violence and had fled out the back and we had to go get him."  (R63 at 36-37).

Deputy Perkins was right under the tree where Harper was. (R64 at 94; R63 at 42; R65 at 26). Harper said "Hey, I'm up here." (R64 at 83). When Perkins called out "He's up in the tree," the officers shined their lights on Harper. (R64 at 83; R62 at 59). They directed him to show his hands and get out of the tree. (R64 at 83-84; R66 at 40). Harper's hands were on the tree. (R64 at 84-85).

As the officers were shouting instructions at Harper, he informed Deputy Perkins that there was a gun in the tree. (R64 at 85). It is undisputed that Canine Officer Gourley did not hear any conversation between Harper and Deputy Perkins. (R65 at 27). Perkins shouted "He's got the fucking gun up in the tree with him." (R64 at 85). When he announced the presence of the gun, Gourley immediately tasered Harper. (R64 at 95; R62 at 59, 94-95; R64 at 82; R65 at 27; R72-3, ¶ 8).

Gourley's taser malfunctioned and did not make a good connection. (R62 at 59; R63 at 82; R65 at 27-28; R72-3, ¶ 8). Harper fell back against the trunk of the tree and began slapping at the taser wires. (R64 at 85, 105; R66 at 47, 50-51; R63 at 82; R65 at 28). Deputy Davis then immediately tasered him. (R64 at 85, 95-96, 105; R62 at 59; R66 at 50; R63 at 82, 92; R65 at 28, 50; R72-3, ¶ 9). Davis's tasering occurred so quickly that Gourley could not have stopped him. (R72-3, ¶ 10). Harper fell from the tree. (R64 at 85, 105; R62 at 59; R66 at 27; R65 at 59).

When this incident occurred, Canine Officer Gourley had recently completed EMT training. (R65 at 68). As part of the EMT training, Gourley had learned that an adult is likely to be seriously hurt if they fall from double their height. (R65 at 68-69). Gourley did not consider Harper to be so high off the ground that he was at risk of serious injury from a fall. (R65 at 68-69).

(iii)    *Statement of the Standard of Review*

This Court reviews *de novo* a district court's denial of summary judgment on qualified immunity grounds, viewing the evidence and drawing all factual inferences in favor of the non-moving party. *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013). The Court "review[s] the evidence this way because the issues appealed here concern not which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of clearly established law." *Id.* (quotations omitted). Consequently, the fact as accepted for summary judgment purposes "may not be the actual facts of the case." *Id.*

The moving party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed.R.Civ.P. 56(c)*. If the non-moving party bears the ultimate burden of proof regarding the

claim at issue in the motion, that party, in response to the motion, must go beyond the pleadings and establish, through competent evidence, that there truly is a genuine, material issue to be tried. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Although the Court generally is to view disputed evidence in the light most favorable to the non-moving party,

> when conflicts arise between the facts evidenced by the parties, [the Court must] credit the nonmoving party's *version*. [The] duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part: the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided.

*Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (*en banc*) (emphasis in original). The non-moving party must present enough evidence to demonstrate that he can meet the substantive evidentiary standards that apply to the case, that is, that a jury might return a verdict in his favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

"For factual issues to be considered genuine, they must have a real basis in the record." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

## SUMMARY OF THE ARGUMENT

The district court erred in denying qualified immunity to Canine Officer Gourley based on his unsuccessful attempt to taser a violent, intoxicated suspect who had fled into a wooded area in the middle of the night with a rifle he had just discharged in the family residence, who was located hiding in a tree, and who—the officer was informed immediately before the attempted tasering—had the rifle "up in the tree with him."

The district court erred in finding and relying on "facts" not supported by the evidence or applicable under the governing legal standards.  Although the facts must be viewed in the light most favorable to the plaintiff, those facts must be viewed from the perspective of a reasonable law enforcement officer and without the benefit of hindsight, which the district court did not do.  By failing to consider the evidence from this perspective, the court erred in (1) concluding that the quantum of force used by Officer Gourley was substantial; (2) weighing Harper's claimed—but unknown to Gourley—attempt to surrender in considering the risks Harper posed to the officers and whether he was resisting arrest; (3) determining that Gourley knew that Harper's rifle was out of reach; and (4) failing to take into account Harper's elevated, tactically superior position in considering the risk he presented.

Once the evidence is properly viewed from the appropriate perspective, the record shows that the district court erred in concluding that Harper presented an actionable constitutional violation by Officer Gourley. Viewing the totality of the circumstances, the force used against Harper was justified. From Gourley's perspective, Harper had committed several violent crimes, the threat he posed with a rifle from his elevated position in the tree was high, and Harper was not surrendering. Additionally, Gourley cannot be held vicariously liable for Deputy Davis's tasering of Harper, especially as he was not in a position to intervene.

Finally, the district court erred in denying qualified immunity to Officer Gourley as the asserted constitutional violation was not clearly established under either the "obvious clarity" doctrine or by substantially similar case law.

## ARGUMENT AND CITATION OF AUTHORITY

I.    **The district court erred in denying qualified immunity to Canine Officer Gourley based on his unsuccessful attempt to taser a violent, intoxicated suspect who had fled into a wooded area in the middle of the night with a rifle he had just discharged in the family residence, who was located hiding in a tree, and who—the officer was informed immediately before the attempted tasering—had the rifle "up in the tree with him"**

      A.    **The district court erred in finding and relying on "facts" not supported by the evidence or applicable under the governing legal standards**

The district court reached multiple erroneous conclusions based upon the undisputed facts. In particular, the court based its decision upon the perspective of Harper and not that of Officer Gourley. On summary judgment, in a use-of-force case, "[t]hough the facts must be taken in the light most favorable to [the plaintiff], the determination of reasonableness must be made from the perspective of the officer." *Robinson v. Arrugueta*, 415 F.3d 1252, 1255 (11th Cir. 2005). Additionally, the reasonableness assessment must be made from the point in time when the force was used, "rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

"[T]he right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* Whether the amount of force used was reasonable "requires careful attention to the facts and

circumstances of each particular case." *Id.* Factors to be considered include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "The only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009).

The district court erred in ruling that the quantum of force used was substantial. (R97 at 11). Instead of considering the actual amount of force used by Officer Gourley—a negligible amount considering that the taser malfunctioned—the court improperly focused on the fact that Harper was several feet off the ground and emphasized his "precarious position . . . by the fact that his fall has left him paraplegic." (*Id.* at 12). This is error for at least two reasons. First, this aspect of the ruling ignores the uncontroverted evidence in the record. Gourley testified that, at the time of the incident, he had recently completed EMT training. (R65 at 68). In that training, he had learned that an adult is likely to be seriously hurt only if he falls from double his height. (*Id.* at 68-69). Gourley did not consider Harper to be so high off the ground that he was at serious risk from a fall. (*Id.*). The quantum of force used must be assessed in light of this undisputed evidence. Second, the court's consideration of the injury Harper ultimately

suffered improperly views the evidence "with the 20/20 vision of hindsight."
*Graham*, 490 U.S. at 396.

The district court erred in finding that Harper, by his alleged compliance
with the officers' directives, verbally or orally communicated an intent to surrender
to Officer Gourley. Central to the district court's discussion of Harper's supposed
lack of threat to the officers and his purported non-resistance to arrest is the
following:

> Plaintiff . . . contends he was complying with the
> officer's demands to the fullest extent possible and had
> his hands raised and visible when he was tased. . . .
> Under Plaintiff's version of events, he was being as
> compliant as he possible could be. He had complied with
> what he deemed to be the most important command, to
> show his hands, he had informed Defendants that it was
> impossible for him to comply with both commands, and
> had begged Defendants for information on how he was to
> proceed.

(R97 at 14-15). For purposes of summary judgment, Gourley acknowledges that
the district court was obligated to accept Harper's assertion that he meant to
surrender and had no subjective intent to either harm the officers or to run away
any farther than he had already. For purposes of summary judgment, the district
court did not err to the extent that it concluded that Harper may have
communicated his intentions to Deputy Perkins. The record, however, is devoid of
evidence that Canine Officer Gourley had any awareness of these "facts." Instead,

the record supports only the conclusion that, *from his perspective*, Gourley, though perhaps ultimately mistaken, reasonably could have believed that Harper continued to pose an active threat and was not surrendering. *See Glenn v. City of Columbus, Ga.*, 375 Fed.Appx. 928, 932 (11th Cir. 2010) ("reasonable officers may incorrectly perceive the seriousness of a threat").

In his statement of material facts, Gourley stated that he "did not hear any conversation between Plaintiff and Deputy Perkins," citing his deposition testimony. (R72-2, ¶ 81; R65 at 27). In his response, Harper denied this statement, but then said only that "[w]hile Gourley swore to that, he is not worthy of belief." (R80, ¶ 81). Harper cited no evidence. Gourley's statement that he did not hear the conversation, therefore, must be accepted. *Mize*, 93 F.3d at 742; *Ellis*, 432 F.3d at 1326.

Moreover, there is plenty of evidence in the record to support this fact and none to controvert it. Harper testified that, after he was located in the tree, "they all started hollering . . . . And they kept hollering at me . . . . They kept hollering at me. . . . they kept screaming at me . . . ." (R64 at 83-84). He further stated that, after remembering that the gun was in the tree,

> It hit me that—I told Chris Perkins, I said—I said—they was all screaming and hollering at me. Chris was standing right there below me looking—looking right down at—I was looking down at him and I—and it hit

> me that gun was down there at the bottom of that tree.[7] I
> told Chris Perkins that that gun was in that tree.

(*Id.* at 84-85). More to the point, according to Harper, at the time he was having

this conversation about the gun with Deputy Perkins, "[a]ll the other guys was still

hollering at me and screaming at me." (*Id.* at 85). Later in the deposition, Harper

said that he "did not talk to any of the other cops that I recall of. Like I said, Chris

Perkins was the one that I was mainly focused on and all the other ones was just

screaming and hollering at me." (*Id.* at 109). Given all of the "hollering" and

screaming that was going on, there is no evidence that Officer Gourley could have

heard the conversation between Harper and Deputy Perkins, much less that he did.

Additionally, although the district court placed great emphasis on the "fact"

that Harper supposedly had his hands in the air in the traditional surrender pose

(R97 at 14-15), Harper, in his deposition, repeatedly testified that his hands

actually were on the tree during the crucial time period. Just sentences after he

claimed he was telling Deputy Perkins "My hands is out," he said that "so I *took*

*my hands off this limb* right here . . . . *I took my hands and I pushed myself back*

off the tree like that (demonstating)." (R64 at 84) (emphasis added). On the next

---

[7] Harper's earlier testimony makes clear that the gun was not actually "at the
bottom of that tree." He stated that he "set it up in the—in the forks of the tree
right in the center of it" and then, on a photograph, marked a spot several feet off
the ground. (R64 at 74-77 and Exh. D4).

page, he described his stance at the moment that he was tasered: "I was standing there *holding the limb* like this right here (demonstrating). . . . I was sitting there *holding on that tree* and they shot me." (*Id.* at 85) (emphasis added). Once the first taser was fired, Harper let go of the tree "[a]nd before I could get a hold *again*, somebody shot me again." (*Id.*) (emphasis added). In other words, based on his own testimony, it is clear that Harper was not making any obvious gestures of surrender. He was holding on to the tree.

Accepting Plaintiff's testimony for purposes of summary judgment, however much he may have intended to surrender, there is no evidence that he communicated that intention to Canine Officer Gourley, either orally or physically. Accordingly, the district court erred when it considered Harper's purported efforts at surrender as part of its analysis of the situation Officer Gourley faced at the moment he attempted to taser Harper. *Garczynski*, 573 F.3d at 1166 ("The only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded"); *Robinson*, 415 F.3d at 1255 ("the determination of reasonableness must be made from the perspective of the officer").

The district court further erred in concluding that "[v]iewing the[] facts in the light most favorable to Plaintiff, a jury could find the rifle was out of Plaintiff's reach and that this fact was apparent to Officers Gourley and Davis." (R97 at 14).

Based on Harper's testimony, a jury could perhaps find that the rifle was out of his reach, but the evidence would not support a finding that this fact was apparent to Gourley or any reasonable officer in his position. Again, based on Harper's testimony, immediately after Deputy Perkins located him, Perkins shouted out that "he's got the fucking gun up in the tree with him." (R64 at 85). Immediately after that warning that Harper had the gun "with him," Gourley attempted to tase Harper. (*Id.* at 95). As the district court correctly found, based on Harper's testimony, "[f]rom the time Plaintiff informed Defendants of his location up in the tree until the time he was tased was a matter of seconds." (R97 at 8 (*citing* R64 at 93-94). Knowledge that the firearm was out of Harper's reach cannot be imputed to Canine Officer Gourley, even under the most generous reading of Harper's testimony.

Finally, the district court erred in failing to take into account Harper's elevated position and the advantage this provided him in the event he accessed his firearm or decided to jump using the knife he possibly possessed. (*Compare* R62 at 79, R63 at 35, R65 at 9, R66 at 36 (undisputed that officers were told that Harper fled into woods with rifle and possibly a knife) and R63 at 100, 102, 104 (undisputed that Harper had tactical advantage in tree) *with* R97 at 13-15 (analyzing threat without mention of Harper's superior positioning)). The court

thus failed to consider the totality of the circumstances in weighing the risks the officers faced. *See Beecher v. City of Tacoma*, 2012 U.S. Dist. LEXIS 71927, 26-27 (W.D. Wash. 2012) (weighing suspect's tactically superior position in determining the risk he posed).

### B.     The evidence, properly viewed, failed to establish an actionable constitutional violation by Canine Officer Gourley

1.     *The tasering of Harper did not constitute excessive force under the totality of the circumstances*

Once the evidence is properly considered under the applicable legal standards, it is clear that the amount of force used on Harper was appropriate. "[T]he right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. Whether the amount of force used was reasonable "requires careful attention to the facts and circumstances of each particular case." *Id.* Factors to be considered include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular

situation." *Id.* at 396-97. "[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007). The inquiry must make allowance for the fact that "reasonable officers may incorrectly perceive the seriousness of a threat." *Glenn*, 375 Fed.Appx. at 832. Additionally, the threat assessment is to include not just the momentary threat to the officers involved, but the possible threat that might have been involved if the suspect had not been apprehended. *Long*, 508 F.3d at 581. "The only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *Garczynski*, 573 F.3d at 1166.

The reasonableness inquiry is an objective one based on the totality of the circumstances. *Graham*, 490 U.S. at 397; *Draper v. Reynolds*, 369 F.3d 1270, 1277 (11th Cir. 2004). "[R]easonableness—on a given set of facts—is a pure question of law." *Buckley v. Haddock*, 292 Fed.Appx. 791, 794 (11th Cir. 2008).

Applying the three-factor *Graham* balancing test to the properly construed evidence, the totality of the circumstances shows that the weighing of the evidence favors Gourley:

*Severity of the crime*: The district court correctly concluded that this factor weighed in favor of Canine Officer Gourley. (R97 at 12-13). Based on the

information he and the other officers had been given, Gourley had good reason to believe that Harper had committed more than ten crimes,[8] most of which involved violence or threats of violence. (R67-2 at 1-4; R62 at 57-58, 62, 66, 68-69, 72, 79, 105; R63 at 34-35; R65 at 8-9, 21, R66 at 32, 36). Harper had, so the officers understood, beaten Crimmins in the presence of one of their children, threatened Singleton with a rifle, and discharged the rifle in the house, all while intoxicated and possibly also high. (*Id.*). These crimes are violent and severe. They are noticeably more serious than those in several other cases in which tasering or similar (or more elevated) uses of force have been upheld. *See, e.g., Edwards v. Shanley*, 666 F.3d 1289, 1295 (11th Cir. 2012) (initial use of dog bite acceptable for suspect fleeing routine traffic stop); *Draper*, 369 F.3d 1270 (use of taser after routine traffic stop); *Oakes v. Anderson*, 494 Fed.Appx. 35, 36, 39 (11th Cir. 2012)

---

[8] The information provided to the officers, including Gourley, could describe at least the following crimes: (1) simple assault, O.C.G.A. § 16-5-20; (2) aggravated assault, O.C.G.A. § 16-5-21; (3) simple battery, O.C.G.A. § 16-5-23; (4) battery, O.C.G.A. § 16-5-23.1; (5) family violence battery, O.C.G.A. § 16-5-23.1(f); (6) cruelty to children, O.C.G.A. § 16-5-70; (7) terroristic threats, O.C.G.A. § 16-11-37; (8) disorderly conduct, O.C.G.A. § 16-11-39; (9) pointing or aiming a gun or pistol at another, O.C.G.A. § 16-11-102; (10) possession of a firearm during the commission of or attempt to commit another crime, O.C.G.A. § 16-11-106; (11) discharging a firearm while under the influence of alcohol or drugs, O.C.G.A. § 16-11-134; and (12) possession of a Schedule II controlled substance, O.C.G.A. §§ 16-13-26, 16-13-30.

(deadly force used against man who "had committed no crime"); *Buckley*, 292 Fed.Appx. 791 (use of taser after routine traffic stop).

*Threat to safety*:   The district court erroneously deemed Harper to be a minimal threat to the officers because of his claimed attempt to surrender.  (R97 at 13-15).  As demonstrated above, Canine Officer Gourley had no knowledge of this attempt.   Instead, based on Harper's own testimony and the uncontroverted evidence, from Officer Gourley's perspective, viewing the totality of the circumstances, this is what the threat looked like:

- He was tracking a suspect who had, in the family residence, engaged in violence and threatened violence against family members and in front of children.  (R67-2 at 1, 3-4; R62 at 57-58, 62, 68-69, 72, 79; R63 at 34-35; R65 at 8; R66 at 32, 36); *see Fils v. City of Aventura*, 647 F.3d 1272, 1289 (11th Cir. 2011) (use of taser "could be appropriate where an officer reasonably believes the suspect is violent").

- The suspect had with him a firearm he had already discharged and possibly also a knife.  (R62 at 57-58, 62, 72; R63 at 35; R64 at 68; R65 at 9; R67-2 at 4); *see Fils*, 647 F.3d at 1289.

- The suspect was intoxicated and possibly also high.  (R62 at 57, 66, 79, 105; R64 at 45-48; R65 at 9; R66 at 36).  His judgment was impaired.  *See Taylor v. Freeman*, 447 Fed.Appx. 78, 81 (11th Cir. 2011) (plaintiff's intoxication a factor in determining threat level to officer).

- The search was conducted at night in a wooded area.  (R62 at 56, 58, 61; R63 at 100; R65 at 8; R67-2 at 1; R72-3, ¶¶ 4-5); *see Edwards*, 666 F.3d at 1295 ("that the individual had fled at night into nearby woods created further reason to be apprehensive"); *Buckley*, 292 Fed.Appx. at 794 (weighing fact that "the incident occurred at night").

- The suspect was located up in a tree, an elevated, tactically advantageous position. (R63 at 100, 102, 104); *see Beecher*, 2012 U.S. Dist. LEXIS 71927 at 26-27 (weighing suspect's tactically superior position in determining the risk he posed).

- *Immediately* after Harper was located, Deputy Perkins shouted out, "He's got the fucking gun up in the tree *with him*." (R64 at 82) (emphasis added). Notably, Perkins did not say something that would have eased the obvious tensions, such as "hold on a minute, guys, I need to get this gun out of the tree first before he can climb down." Indeed, Perkins did not even simply say "He's got the fucking gun up in the tree." Instead, Perkins shouted that Harper had the gun "*with him*."

A reasonable law enforcement officer in Gourley's position would have understood this as a warning that Harper was in possession of a firearm, and thus, posed a serious threat. Gourley was not required to wait until additional information was available about the gun and its specific location before he acted to protect himself, his fellow officers, and the neighbors who lived nearby. *See Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) ("Gutierrez was not required to wait and hope for the best"); *Long*, 508 F.3d at 581 ("the law does not required officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect"); *Oakes*, 494 Fed.Appx. at 39-41. A reasonable officer would have perceived the threat level as high. That such an officer might ultimately be mistaken does not matter. *Glenn*, 375

Fed.Appx. at 832 ("reasonable officers may incorrectly perceive the seriousness of a threat").

*Resisting or attempting to evade arrest*:

Harper already had fled the scene of his violence. (R62 at 58, 69; R64 at 68). When he saw law enforcement arriving, he hid himself in a tree. (R64 at 78). He was in an advantageous position with a gun, and therefore, not safely in police custody. (R63 at 42; R64 at 78, 83; r65 at 26). *See Buckley*, 292 Fed.Appx. at 794 ("we . . . credit the government with a significant interest in enforcing the law on its own terms, rather than on the terms set by an arrestee"). Contrary to the district court's conclusion, whatever Harper's intentions, he did not signify to a reasonable officer in Gourley's position that he was surrendering.

The district court thus erred in holding that the totality of the circumstances favored Harper. Two of the three factors of the *Graham* test weigh heavily in Canine Officer Gourley's favor. Gourley reasonably believed that Harper had committed several serious violent crimes. A reasonable officer in Gourley's position could have easily concluded that Harper posed a continuing danger to Gourley, the Coffee Deputies, and to everyone who lived in the neighborhood. The third factor also weighs in Gourley's favor, just perhaps not so heavily; Harper

was not at that moment actively running away, but he had shown a propensity to flee and was out of the officers' reach with a gun.

It is not unlawful that, *immediately* after Deputy Perkins shouted out his warning that Harper had a gun "up in the tree with him," Officer Gourley attempted to taser Harper. (R64 at 85, 95). *Immediately* after Gourley's attempt failed, Deputy Davis tasered Harper. (*Id.* at 95-96). In a tense, uncertain moment, the officers made a split-second judgment to use force against a suspect they reasonably believed was armed and violent. *Graham*, 490 U.S. at 396-97. The use of the taser was justified.

2.    *Canine Officer Gourley cannot be held liable for Deputy Davis's tasering of Harper*

The district court erroneously found that Officer Gourley could be held liable for Deputy Davis's tasering of Harper in the seconds immediately subsequent to the discharge of his own taser. (R97 at 16). A § 1983 claim cannot be based upon vicarious liability. *Brown v. Smith*, 813 F.2d 1187 (11th Cir. 1987). There must be an affirmative link between the defendant's actions or inactions and the alleged deprivation of a constitutional right. *Rizzo v. Goode*, 423 U.S. 362 (1976); *Goebert v. Lee*, 510 F.3d 1312, 1332 (11th Cir. 2007). "[E]ach Government official . . . is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).

A police officer has an obligation to intervene to prevent or stop the use of excessive force when he witnesses such and is in a position to intervene. *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 927 (11th Cir. 2000); *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1441-42 (11th Cir. 1985). An officer is not liable when events occur so quickly that he cannot intervene. *Fils*, 647 F.3d at 1290 n.21; *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 740 n.25 (11th Cir. 2010).

Although Canine Officer Gourley admittedly attempted to taser Harper, his taser malfunctioned and did not deliver much of a charge. (R62 at 59; R63 at 82; R65 at 27-28, R72-3, ¶ 8). It was not his tasering of Harper that caused him to fall from the tree. (R64 at 85, 95-96, 105; R62 at 59; R66 at 27, 50; R63 at 822, 92; R65 at 28, 50, 59; R72-3, ¶ 9). Holding Officer Gourley liable here would be the equivalent of holding a law enforcement officer liable if he swung his fist at a suspect—and missed—but another officer then connected afterwards. There is simply no precedent for such liability.

The district court did not specifically address the failure-to-intervene issue concerning Officer Gourley. With regard to Deputies Courson and Perkins, however, the court held that they "had no opportunity to intervene prior to Officer Davis's deployment of the taser." (R97 at 19). This same reasoning applies to Gourley. (R72-3, ¶ 10).

3.  *The evidence did not demonstrate a clearly established constitutional violation*

Qualified immunity protects governmental defendants sued in their individual capacities so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). Qualified immunity applies regardless of whether the official's alleged error was a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009). "Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." *Hudson v. Hall*, 231 F.3d 1289, 1297 (11th Cir. 2000). "Government officials are not required to err on the side of caution when it comes to avoiding constitutional violations." *Crosby v. Monroe*, 394 F.3d 1328, 1334 (11th Cir. 2004) (internal quotations omitted); *see also Maddox v. Stephens*, No. 12-15237, man.op. at 23 (11th Cir. Aug. 21, 2013) (qualified immunity "prevents public officials from being intimidated . . . from doing their jobs").

The plaintiff must show that the constitutional right asserted was clearly established at the time the alleged violation occurred. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). To make this showing, a plaintiff must identify either (1) earlier case law from the Supreme Court, this Court, or the Georgia Supreme Court that is

34

materially similar to the instant case, and thus, provided clear notice of the asserted

constitutional right; or (2) general rules of law that apply with obvious clarity to

the circumstances, clearly establishing the unlawfulness of the defendant's

conduct. *Long*, 508 F.3d at 584. "'[O]bvious clarity' cases will be rare." *Coffin v.*

*Brandau*, 642 F.3d 999, 1015 (11th Cir. 2011) (*en banc*); *see also Vinyard*, 311

F.3d at 1355 ("the 'obvious clarity' standard is often difficult to meet").   In

particular, use-of-force cases, which involve reasonableness and balancing, "are

extremely fact dependent," and thus, not readily susceptible to the "obvious

clarity" doctrine. *Long*, 508 F.3d at 585.

> [P]reexisting, factually similar cases are—not always,
> but . . . usually—needed to demonstrate that officials
> were fairly warned that their application of force violated
> the victim's constitutional rights.   Officers facing split
> second decisions in dangerous or life-threatening
> situations are seldom provided with fair warning, notice
> or guidance by a general requirement of 'reasonableness.

*Willingham v. Loughnan*, 321 F.3d 1299, 1303 (11th Cir. 2003) (internal

quotations omitted).   In the absence of "particularized caselaw," this Court will

deny an officer qualified immunity in a force case only when "the official's

conduct was so far beyond the hazy border between excessive and acceptable force

that [the official] had to know he was violating the Constitution even without

caselaw on point." *Id.*   This is not such a case.

The district court denied Canine Officer Gourley qualified immunity based on both the "obvious clarity" doctrine and its reading of specific caselaw. (R97 at 17-18). Both aspects of the ruling are based on the court's failure, as discussed above, to view the situation from the perspective of Officer Gourley and instead to credit Harper with an intention to surrender that was never communicated to Gourley nor, from Gourley's perspective, could that attempted surrender be deemed "obvious."

The "obvious clarity" portion of the court's immunity analysis relies heavily on the supposed "fact" that Harper's hands were in the air, and thus, was surrendering and not a threat. (R97 at 17). As shown above though, Harper's own testimony indicated that his hands were on the tree, not raised in unmistakable surrender. (R64 at 84-85). Once the evidence is properly viewed from the perspective of what Officer Gourley knew, it is clear that the analysis must be based on the fact that a reasonable officer would have perceived a serious threat. His actions were not "so far beyond the hazy border between excessive and acceptable force" as to be unconstitutional with obvious clarity. *Willingham*, 321 F.3d at 1303.

Likewise, the similar-caselaw portion of the court's discussion relies solely on cases wherein "a police officer used excessive force by hitting a suspect who

was complying with officer commands and not resisting arrest." (R97 at 18). The record here, on the other hand, shows that, from Officer Gourley's perspective, Harper was in a tree with a firearm and not making any obvious efforts to either climb down or otherwise surrender. Harper was, from a reasonable officer's perspective, non-compliant and potentially dangerous. The cases cited are not materially similar to that presented here.

Additionally, it is not clearly established that a law enforcement officer can be held liable for an attempted—but unsuccessful—use of force.

The district court's ruling improperly requires law enforcement officers in dangerous situations to "err on the side of caution." *Crosby*, 394 F.3d at 1334; *see also Jean-Baptiste*, 627 F.3d at 821 (officer "not required to wait and hope for the best"). The district court erred in denying qualified immunity to Officer Gourley.

## CONCLUSION

WHEREFORE, for all of the above and foregoing reasons, Officer Gourley submits that this Court should reverse the order of the District Court (R97) insofar as that order denied his motion for summary judgment and remand this matter to the District Court with direction to enter judgment in his favor.

Respectfully submitted,

| | |
|---|---|
| SAMUEL S. OLENS<br>Attorney General | 551540 |
| NELS PETERSON<br>Solicitor General | 101074 |
| KATHLEEN M. PACIOUS<br>Deputy Attorney General | 558555 |
| DEVON ORLAND<br>Senior Assistant Attorney General | 554301 |

/s/ Laura L. Lones
LAURA L. LONES                                       456778
Assistant Attorney General

Please serve:
LAURA L. LONES
40 Capitol Square, S. W.
Atlanta, Georgia 30334-1300
(404) 463-8850

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,
## AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Fed.R.App.P.32(a)(7)(B) because this brief contains 8,475 words, excluding the parts of the brief exempted by Fed.R.App.P.32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed.R.App.P.32(a)(5) and the type style requirements of Fed.R.App.P.32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 and is typed in 14 point Times New Roman font.

/s/ Laura L. Lones
LAURA L. LONES
Assistant Attorney General
Attorney for Appellant Gourley

Dated: This 3rd day of September, 2013.

## CERTIFICATE OF SERVICE

I do hereby certify that I have this day filed with the court, electronically filed with the Court, and served the within and foregoing pleading, prior to filing the same, by depositing a copy thereof in the United States Mail, properly addressed upon:

Robert P. Killian
506 Monk Street
Brunswick, Georgia  31520

J. Alexander Atwood
Atwood Law Firm, PC
1515 Newcastle Street
Brunswick, Georgia  31520

Richard K. Strickland
Brown, Readdick, Bumgartner, Carter, Strickland & Watkins, LLP
P.O. Box 220
Brunswick, Georgia  31521-0220

This 3rd day of September, 2013.

/s/ Laura L. Lones
LAURA L. LONES
Assistant Attorney General
Attorney for Appellant Gourley